NATIONAL INDUSTRIAL SAND ASSOCIATION, a Delaware Corporation, et al., Petitioners,

The China Clay Producers, Intervenor,

v.

F. Ray MARSHALL, Secretary of Labor, United States Department of Labor, and Robert B. Lagather, Assistant Secretary for Mine Safety and Health Administration, United States Department of Labor, Respondents.

The COUNCIL OF the SOUTHERN MOUNTAINS, INC., Petitioner,

v.

F. Ray MARSHALL, in his capacity as Secretary of Labor, United States Department of Labor, and Robert Lagather, in his capacity as Assistant Secretary of Labor, Mine Safety and Health Administration, Respondents,

China Clay Producers, Intervenor.

Nos. 78–2446, 79–1159.

United States Court of Appeals, Third Circuit.

Argued April 3, 1979.

Decided May 16, 1979.

David S. Smith, Michael T. Heenan (argued), Kilcullen, Smith & Heenan, Washington, D. C., for petitioners National Industrial Sand.

C. Christopher Hagy, Gordon O. Pehrson, Jr. (argued), William H. Penniman, John D. Sharer, Sutherland, Asbill & Brennan, Washington, D. C., for intervenor The China Clay Producers.

Carin Ann Clauss, Sol. of Labor, Morell E. Mullins, Associate Sol., Edward P. Clair, Thomas A. Mascolino, Counsel, Washington, D. C., Manuel R. Lopez, Dennis R. McDaniel, Ronald E. Meisburg (argued), Robert C. Snashall, Jr., Attys., Washington, D. C., Alan Yamamoto, Atty., U. S. Dept. of Labor, Arlington, Va., J. Davitt McAteer (argued), L. Thomas Galloway, Center for Law and Social Policy, Washington, D. C., for petitioner The Council of the Southern Mountains, Inc.

Before SEITZ, Chief Judge, and HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

We are presented on this appeal with challenges by mine operators and by miners to training regulations which have been promulgated by the Secretary of Labor.

Section 115 of the Federal Mine Safety and Health Act of 1977 (Mine Act),[1] requires every mine operator to have a health and safety training program for miners. Each program must be approved by the Secretary of Labor (Secretary). The Secretary is required to publish regulations governing such programs. In accordance with this requirement, regulations were published by the Secretary on October 13, 1978.[2] The training regimen established by the regulations is rigorous and generally costly, and the scope of its coverage is broad.

Judicial review of the Secretary's regulations is provided for in the Mine Act itself.[3] Two petitioners, the National Industrial Sand Association, et al. (NISA), and the Council of the Southern Mountains, Inc. (CSM), and one intervenor, the China Clay Producers (CCP), have sought review of the training regulations in this court. Both NISA and CCP represent the interests of mine operators, and they attack certain regulations which would entail a high compliance cost for mine operators. CSM represents the interests of miners; it contends that the regulations, in certain respects, fail to protect adequately the interests of miners. All challengers contend that the offending regulations are invalid because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and because they are in excess of the Secretary's statutory authority.

Our review of the training regulations leads us to the conclusion that they represent a reasonable and statutorily authorized exercise of the Secretary's rulemaking power. We do not consider the applicability of these regulations to the dredging industry, however, because we have determined that this issue is not properly presented for review at this time.

## I. THE TRAINING REGULATIONS.

Statutory authorization for the Secretary to promulgate training regulations is set forth in section 115(a) of the Mine Act:[4]

(a) Each operator of a coal or other mine shall have a health and safety training program which shall be approved by the Secretary. The Secretary shall promulgate regulations with respect to such health and safety training programs not more than 180 days after the effective date of the Federal Mine Safety and Health Amendments Act of 1977. Each training program approved by the Secretary shall provide as a minimum that—

(1) new miners having no underground mining experience shall receive no less than 40 hours of training if they are to work underground. Such training shall include instruction in the statutory rights of miners and their representatives under this chapter, use of the self-rescue device and use of respiratory devices, hazard recognition, escapeways, walk around training, emergency procedures, basic ventilation, basic roof control, electrical hazards, first aid, and the health and safety aspects of the task to which he will be assigned;

(2) new miners having no surface mining experience shall receive no less than 24 hours of training if they are to work on the surface. Such training

1. 30 U.S.C. § 825.

2. 43 Fed.Reg. 47454–68 (1978), *as corrected*, 44 Fed.Reg. 1979–80 (1979), *to be codified at* 30 C.F.R. §§ 48.1–48.12, 48.21–48.32 [hereinafter cited as 30 C.F.R. § ——].

 The regulations of the Secretary were promulgated under the auspices of the Mine Safety and Health Administration of the Department of Labor. *See* 29 U.S.C. § 557a (Supp. I, 1977) (creating Mine Safety and Health Administration).

3. 30 U.S.C. § 811(d).

4. *Id.* § 825(a).

shall include instruction in the statutory rights of miners and their representatives under this chapter, use of the self-rescue device where appropriate and use of respiratory devices where appropriate, hazard recognition, emergency procedures, electrical hazards, first aid, walk around training and the health and safety aspects of the task to which he will be assigned;

(3) all miners shall receive no less than eight hours of refresher training no less frequently than once each 12 months, except that miners already employed on the effective date of the Federal Mine Safety and Health Amendments Act of 1977 shall receive this refresher training no more than 90 days after the date of approval of the training plan required by this section;

(4) any miner who is reassigned to a new task in which he has had no previous work experience shall receive training in accordance with a training plan approved by the Secretary under this subsection in the safety and health aspects specific to that task prior to performing that task;

(5) any training required by paragraphs (1), (2) or (4) shall include a period of training as closely related as is practicable to the work in which the miner is to be engaged.

5. *Id.* § 811.

6. 5 U.S.C. § 553.

7. 30 U.S.C. § 812.

8. *Id.* § 812(c).

9. NISA, in setting forth the facts of this case in its brief, implies that the composition of the Advisory Committee violated in spirit the requirements of 30 U.S.C. § 812(c) because of the presence as neutral members of two former officials of the Federal Mine Enforcement and Safety Administration. Brief for Petitioner NISA at 8–9 & n. 4. We see little merit in NISA's implication, and forbear from addressing it further.

10. Interested persons were permitted to submit comments to the Committee concerning the draft regulations, and at each session time was

Procedures for promulgation of the Secretary's regulations are set forth in section 101 of the Mine Act,[5] which incorporates by reference section 4 of the Administrative Procedure Act (APA).[6] This section of the APA prescribes notice and comment procedures for informal rulemaking. In accordance with these procedures, the Secretary developed a set of draft regulations designed to implement section 115 of the Mine Act. These draft regulations were then submitted for review to an Advisory Committee composed pursuant to section 102(c).[7] Representatives from three groups—"labor," "industry," and those "individuals who have no economic interests in the coal or other mining industry, and who are not operators, miners, or officers or employees of the Federal Government or any State or local government"[8]—comprised the membership of the Committee.[9] The Advisory Committee met in a number of sessions culminating in the publication of final regulations on October 13, 1978.[10]

As finally promulgated, the regulations contain separate subparts with different substantive requirements and implementation schedules applicable to underground miners and to miners working at surface mines and surface areas of underground mines.[11] This categorization was designed to accommodate basic differences in the conditions under which underground and surface miners worked. The operators of

allotted for interested persons to make brief oral presentations to the Committee. Based on the Advisory Committee's recommendations, proposed regulations were published on July 18, 1978 in the Federal Register. 43 Fed.Reg. 30990–99 (1978). A correction to the proposed regulations was published on August 4, 1978. 43 Fed.Reg. 34504–05 (1978). Further comments from interested persons were invited until August 23, 1978. Additional hearings on the proposed regulations were held in Charleston, West Virginia, St. Louis, Missouri, and Phoenix, Arizona, on August 14, 16 and 18, 1978, respectively. The final regulations were published following analysis of these comments.

11. 30 C.F.R. §§ 48.1–48.12 (underground miners); *id.* §§ 48.21–48.32 (miners working at surface mines and surface areas of underground mines).

both surface and underground mines, however, are required to provide five different types of training. First, training must be provided for all new miners who have no previous experience.[12] Some of this new miner training must be provided before the newly hired miners are assigned work duties. Second, training must be provided for newly employed experienced miners.[13] Third, new task training must be provided to experienced miners assigned to a task in which they have had no previous experience.[14] Fourth, eight hours of annual refresher training must be provided for all miners.[15] Fifth, hazard training—instruction in the recognition of basic mine hazards—must be provided to a certain category of persons defined as miners who are not directly involved in traditional mining activities.[16]

Each operator is required to submit to the Mine Safety and Health Administration (MSHA) a training plan which encompasses the features described above.[17] All training pursuant to these plans must be provided by MSHA-approved instructors.[18] The Secretary contemplates that operators may provide this training individually, or may combine in cooperative ventures or avail themselves of governmental or private institutional facilities in order to provide the training in a more efficient manner.[19] For purposes of the training regulations, the term "operator" is defined in such a way that mining companies will be required to provide training to certain employees of independent contractors performing services for the mining companies.[20] Operators are required to keep records of the training actually provided to miners.[21] Miners, in turn, are entitled to compensation at their regular rates of pay for the time spent in training courses.[22]

Dissatisfaction with these regulations was focussed on the definition of "operator" and on various substantive requirements for the training programs. NISA challenged those regulations which (1) require operators to train nonemployees and persons not directly engaged in the mining process, (2) require operators to provide training only with MSHA-approved instructors, and (3) direct the provision of prework assignment training.[23] It also seeks to challenge a statement contained in the Supplementary Information published with the regulations which indicates that the Secretary intends to apply the training regulations to the dredging industry.

CSM objects to the regulations insofar as they (1) fail to require instruction of new surface miners in training conditions which duplicate actual working conditions, (2) fail to establish explicit guidelines for the development and use of training facilities which duplicate actual underground conditions and fail to provide objective criteria for the approval of such facilities, and (3) fail to specify adequately the required scope of instruction in miners' rights. CSM also makes the general objection that the regulations it challenges are invalid because the regulations and Supplementary Information reflect insufficient analysis of materials contained in the administrative record.

## II. STANDARD OF REVIEW.

Judicial review of regulations promulgated by the Secretary is provided by

12. *Id.* §§ 48.5, 48.25.

13. *Id.* §§ 48.6, 48.26.

14. *Id.* §§ 48.7, 48.27.

15. *Id.* §§ 48.8, 48.28.

16. *Id.* §§ 48.11, 48.31.

17. *Id.* §§ 48.3, 48.23.

18. *Id.* §§ 48.3(h), 48.23(h).

19. *Id.* §§ 48.4, 48.24.

20. *Id.* §§ 48.2(e), 48.22(e).

21. *Id.* §§ 48.9, 48.29.

22. *Id.* §§ 48.10, 48.30.

23. CCP joins NISA's challenge only with respect to the regulations which require operators to train nonemployees and persons not engaged in the mineral extraction process.

section 101(d) of the Mine Act.[24] Left undefined by this section though, is the standard of review under which the Secretary's regulations are to be tested. This interstice has been filled by the legislative history:[25]

In reviewing standards, the Committee intends the Court of Appeals to apply the arbitrary and capricious test, the criterion usually applied to rules issued in accordance with the procedures in section 553 of Title 5 of the United States Code. This test would require the reviewing court to scrutinize the Secretary's action to determine whether it was rational in light of the evidence before him and reasonably related to the law's purposes, and is, in the Committee's view, the appropriate test for judicial review of legislative-type proceedings involving policy judgments in areas where specific factual findings cannot always realistically be made.

As this statement indicates, and as all parties agree, the Secretary's regulations are to be reviewed in accordance with the standards prescribed by the Administrative Procedure Act.

The scope of judicial review of agency action is set forth in section 10(e) of the Administrative Procedure Act:[26]

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observation of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Of particular relevance to review of agency rulemaking are those subsections which require that agency action be set aside when it is beyond the scope of statutory authority or when it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Indeed, these are the two grounds upon which the regulations are attacked in this case.[27] It is to the judicial gloss which has been placed on these subsections that we now turn.

### A. Scope of Statutory Authority.

 We are required by the judicial review provisions of the APA to consider

---

24. 30 U.S.C. § 811(d).

25. S.Rep. No. 95–181, 95th Cong., 1st Sess. 21 (1977); U.S.Code Cong. & Admin.News 1977, pp. 3401, 3421.

26. 5 U.S.C. § 706.

27. Because the parties do not request that we review the Secretary's regulations under any of the other standards enumerated in 5 U.S.C. § 706, we are not called upon to determine the extent of § 706's applicability to informal agency rulemaking. Especially troublesome is the extent of review of the factual predicate for the

agency's rulemaking. *Compare Superior Oil Co. v. FPC*, 322 F.2d 601, 619 (9th Cir. 1963), *cert. denied*, 377 U.S. 922, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964), *with Automotive Parts & Accessories Association v. Boyd*, 132 U.S.App. D.C. 200, 206–208, 407 F.2d 330, 336–38 (1968), *and with Chrysler Corp. v. Dep't of Transportation*, 472 F.2d 659, 667–71 (6th Cir. 1972). *See Delaware Citizens for Clean Air, Inc. v. EPA*, 480 F.2d 972, 976 (3d Cir. 1973). *See generally* Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974).

whether the Secretary acted within the scope of his statutory authority. "This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion." [28] Statutory authorization for promulgation of the regulations at issue here is quite broad. Minimum standards for health and safety training programs are set forth in the statute.[29] Beyond these statutory minima, the statute simply directs that "[t]he Secretary shall promulgate regulations with respect to such health and safety training programs [as are required by the Mine Act] not more than 180 days after the effective date of the Federal Mine Safety and Health Amendments Act of 1977." [30] No sharp constraints on the Secretary's authority are indicated by this sweeping language.[31] Indeed, the parties focus less upon the authority conferred on the Secretary by statute than upon the weight to be accorded the Secretary's interpretation of the Mine Act as it relates to his own authority. The petitioners contend that review concerning the scope of the Secretary's authority involves questions of law and must therefore be plenary and de novo. Not surprisingly, the Secretary rejoins that great deference must be given, as a matter of law, to his construction of the Mine Act.

We think that the weight which we should ascribe to the Secretary's interpretation of the Mine Act is aptly set forth in the Supreme Court's opinion in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153 [67 S.Ct. 245, 91 L.Ed. 136]. See also, *e. g., Gray v. Powell*, 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; *Universal Battery Co. v. United States*, 281 U.S. 580, 583 [50 S.Ct. 422, 74 L.Ed. 1051]. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408 [81 S.Ct. 1529, 6 L.Ed.2d 924].

Accord, *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Atchison, T. & S. F. Ry. Co. v. I. C. C.*, 188 U.S.App. D.C. 360, 366, 580 F.2d 623, 629 (1978).

This standard is especially appropriate in the present case because the statutory provisions given effect by the Secretary's regulations are "yet untried and new." [32]

**28.** *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

**29.** 30 U.S.C. § 825(a), *see* pp. 694–695 *supra*.

**30.** 30 U.S.C. § 825(a).

**31.** Indicative of the broad authority conferred on the Secretary in this area is the unadorned statement in the Mine Act that "[t]he Secretary shall promulgate appropriate standards for safety and health training for coal or other mine construction workers." 30 U.S.C. § 825(d). The requirement that the standards be "appropriate" is hardly a constricting one. No doubt Congress believed that the process by

which the regulations were promulgated, *see* pp. 694- 695 *supra*, would guide their substantive content.

**32.** Not all administrative interpretations of regulatory statutes will be accepted by the courts. As the Supreme Court stated in *Int'l Bd. of Teamsters v. Daniel*, 439 U.S. 551, 566, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979), "this deference [to an agency's statutory construction] is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history." *Cf. General Electric Co. v. Gilbert*, 429 U.S. 125, 140–45, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (less judicial deference required when agency has taken inconsistent positions in promulgating interpreta-

B. *Arbitrary, Capricious, and Abuse of Discretion, or Otherwise not in Accordance with Law.*

 Under section 10(e) of the Administrative Procedure Act, the challenged regulations are to be reviewed to ensure that they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This standard of review was described by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), as follows:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [citations omitted]. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

401 U.S. at 416, 91 S.Ct. at 823–824.[33]

As this standard indicates, the scope of our review is relatively narrow.[34] There will be occasions when "we must affirm decisions with which we disagree" as long as they are rational and reflect a full consideration of relevant factors.[35]

In sum, an agency, if its rulemaking is to be sustained, must demonstrate that it has considered the relevant factors brought to its attention by interested parties during

tive regulations). Similarly, less deference may be called for when an agency is interpreting the scope of its own jurisdiction. *See NLRB v. Catholic Bishop of Chicago,* — U.S. —, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (construction of statute to avoid constitutional issue); *FCC v. Midwest Video Corp.,* — U.S. —, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).

**33.** *Overton Park* involved review of an order of the Secretary of Transportation approving the expenditure of federal funds to finance construction of a highway through a public park. The standard articulated by the Court in *Overton Park* has nonetheless been applied to review of informal agency rulemaking. *See, e. g., Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 405–409, 541 F.2d 1, 33–37, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

**34.** A court may decide all relevant issues of law *de novo* under the standard set forth in 5 U.S.C. § 706(2)(A). *See Western Union Telegraph Co. v. FCC,* 541 F.2d 346, 356–57 (3d Cir. 1976) (Garth, J., dissenting), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

**35.** *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 408, 541 F.2d 1, 36, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Petitioners do not argue that the circumstances of this case make it appropriate that we invoke the so-called "hard look" doctrine, which requires that we apply a strict standard of scrutiny where "administrative action . . . touches on fundamental personal interests in life, health, and liberty." *Environmental Defense Fund v. Ruckelshaus,* 142 U.S.App.D.C. 74, 87–88, 439 F.2d 584, 597–98 (1971). *See Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). No constitutionally protected interests are at stake in this review proceeding. Although the basic interests of miners in health and safety are implicated by the Secretary's regulations, the regulations are not predicated upon scientific or technical judgments. *See Ethyl Corp. v. EPA,* 176 U.S. App.D.C. 373, 406–408, 541 F.2d 1, 34–36, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). There is no reason to believe that notice and comment rulemaking procedures were inadequate to bring to the Secretary's attention all considerations relevant to the promulgation of the rules at issue.

We must also be mindful of the teachings of the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The principal thrust of that decision was to discourage the courts of appeals from engrafting procedural requirements on the rulemaking standards established under section 4 of the APA, 5 U.S.C. § 553. Beyond this, the court did not specifically condemn the "hard look" doctrine. *See id.* at 543, 98 S.Ct. 1197. However, in affirming the issuance of a construction permit by the Atomic Energy Commission, the Court made the following observation, which bears in general on the attitude courts should adopt in scrutinizing agency action: "The fundamental policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action." *Id.* at 558, 98 S.Ct. at 1219.

the course of the rulemaking, and that it has made a reasoned choice among the various alternatives presented.[36]

## III. DEFINITIONS OF "MINER" AND "OPERATOR" IN THE REGULATIONS.

The term "operator" is defined in the Secretary's regulations as "any owner, lessee, or other person who operates, controls or supervises [a mine covered by the Mine Act]; or any independent contractor identified as an operator performing services or construction at such mine."[37] By this regulation, the Secretary has reserved the power to designate certain independent contractors as "operators." Not all independent contractors, however, will be designated as operators. The Secretary is now in the process of promulgating regulations which will specify the standards under which independent contractors will be denominated "operators."[38] Those not so designated will not be required to comply with the training regulations.

"Miner" has been given a dual definition in the regulations, with the definition tied to the type of training which the "miner" is required to receive. For purposes of comprehensive training, "miner" includes "any person working in [a mine covered by the Mine Act] and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards, or who is a maintenance or service worker contracted by the operator to work at the mine for frequent or extended periods."[39] With certain exceptions not relevant here, all

---

**36.** The parties here have strenuously contested the issue of burden of proof. The petitioners assert that the Secretary bears the burden of establishing the reasonableness of the regulations. The Secretary, in contrast, claims that it is for the petitioners to demonstrate that the regulations are unreasonable. Case law on this issue is in a state of flux. *Compare Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071, 1077 (T.E.C.A.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), *with United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 251 (2d Cir. 1977). *See* Leventhal, Environmental Decision-making and the Role of the Courts, 122 U.Pa.L.Rev. 509 (1974).

In *Synthetic Organic Chemical Manufacturers Ass'n v. Brennan*, 503 F.2d 1155 (3d Cir. 1974), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975), a case involving review of permanent occupational health standards promulgated by the Assistant Secretary of Labor for Occupational Safety and Health, this court stated that it must, at a minimum, determine whether the correct legal criteria had been applied and whether statutory procedural requirements had been satisfied. Our later decision in *Atlantic & Gulf Stevedores, Inc. v. OSHRC*, 534 F.2d 541 (3d Cir. 1976), held that the validity of safety and health regulations promulgated by the Secretary of Labor could be challenged in an enforcement proceeding. It then distinguished between the burden of proof on the Secretary when a regulation is challenged on direct review following its promulgation and when it is challenged collaterally in an enforcement proceeding. Reading *Synthetic Organic Chemical Manufacturers Ass'n v. Brennan, supra*, broadly, the court stated in dicta that "in a [direct review] proceeding the Secretary has an affirmative burden to demon-

strate the reasonableness of an adopted standard." 534 F.2d at 551. Perhaps better authority for this proposition would have been our earlier decision in *Dry Color Manufacturers' Ass'n v. Dep't of Labor*, 486 F.2d 98 (3d Cir. 1973), which appeared to assume implicitly that the Secretary bore such a burden.

We need not decide at this time whether the burden of proof rules announced in these cases apply to regulations promulgated under the Mine Act. The Mine Act itself, in contrast to the holding in *Atlantic & Gulf Coast Stevedores*, prohibits collateral attack on mandatory health and safety standards. 30 U.S.C. § 811(d). Also, as Judge Leventhal has ably suggested, burden of proof rules must, to some degree, be formulated with a view to the subject matter with respect to which the agency has acted. Leventhal, Environmental Decision-making and the Role of the Courts, 122 U.Pa.L. Rev. 509, 535–36 (1974). *See International Harvester Co. v. Ruckelshaus*, 155 U.S.App. D.C. 411, 438–39, 478 F.2d 615, 642–43 (1973); K. C. Davis, Administrative Law Treatise § 6:15 (2d ed. 1978). We will assume without deciding that the Secretary has the burden of production and persuasion as to the reasonableness of the regulations at issue, for we think that the Secretary has sustained this burden in any event.

**37.** 30 C.F.R. §§ 48.2(e), 48.22(e). The definition set forth in the regulation tracks closely the language of the statute. *See* 30 U.S.C. § 802(d).

**38.** Supplementary Information, 43 Fed.Reg. 47454, 47455 (1978).

**39.** 30 C.F.R. §§ 48.2(a)(1), 48.22(a)(1).

other persons working in mines covered by the Mine Act are also defined as miners, but are required to receive only hazard training.[40] Thus all persons *working in* covered mines are defined as miners, and it is only the difference in degree of participation in the mining process which determines whether the miner is to receive comprehensive training or hazard training.

The definition of "miner" is sufficiently broad to include within its scope all employees of independent contractors who work in mines. In contrast, the definition of "operator" permits the Secretary to designate fewer than all independent contractors as "operators." The noncongruence between these definitional regulations means that mine operators (hereinafter referred to as "mining companies") other than independent contractors will be required, in certain circumstances, to provide health and safety training to the employees of independent contractors. NISA and CCP object to the fact that mining companies will be required to provide such training to persons who are not employed by them, i.e., "nonemployees." They also object to the regulations' broad definition of "miner" insofar as it includes persons not directly involved in the extraction and production process.

### A. *Statutory Authority.*

■ With respect to the definition of "operator" promulgated by the Secretary, the sole issue which we must decide here is whether the Secretary was statutorily authorized to include fewer than all independent contractors as operators for purposes of the training regulations. In other words, we must determine whether the Secretary was authorized to exempt certain independent contractors from coverage as operators under the Mine Act. No challenge is raised at this time to the standards by which the Secretary will identify certain independent

contractors as operators required to comply with the training regulations. Presumably, regulations establishing these standards, which are now being promulgated, will be subject to judicial review when finally issued.

The statutory definition of operator, in our view, neither mandates nor precludes the definition contained in the Secretary's regulations. After examining the text of the statute in the context of its legislative history, the purposes of the statutory scheme, and the deference to which the Secretary's interpretation is entitled, we are of the view that the definition contained in the regulations is within the scope of the statutory authorization.

"Operator" is defined in the Mine Act as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." [41] As this definition indicates, some, if not all, independent contractors are to be regarded as operators. The reference made in the statute only to independent contractors who "perform[ ] services or construction" may be understood as indicating, however, that not all independent contractors are to be considered operators. There may be a point, at least; at which an independent contractor's contact with a mine is so infrequent or *de minimis* that it would be difficult to conclude that services were being performed. Such a reading of the statute is given color by the fact that other persons deemed operators must "operate[ ], control[ ], or supervise[ ]" a mine. Designation of such other persons as operators thus requires substantial participation in the running of the mine; the statutory text may be taken to suggest that a similar degree of involvement in mining activities is required of independent contractors before they are designated as operators.[42]

---

**40.** *Id.* §§ 48.2(a)(2), 48.22(a)(2).

**41.** 30 U.S.C. § 802(d).

**42.** A similar inference was drawn by the court in *Association of Bituminous Contractors, Inc.*

*v. Andrus,* 189 U.S.App.D.C. 75, 83, 581 F.2d 853, 861 (1978) (footnotes omitted):

 It is a fundamental rule, too often neglected, that in statutory construction the primary dispositive source of information is the wording of the statute itself. Under 30 U.S.C. § 819(a)(1), "[t]he *operator* of a coal mine in

More informative than the statutory text in this case is the legislative history. Under the Federal Coal Mine Health and Safety Act of 1969 (Coal Act), the predecessor to the Mine Act, the definition of operator made no reference to independent contractors. As a consequence, doubt arose as to whether independent contractors were subject to regulation under the Coal Act. Such doubt was resolved in favor of the government's regulatory authority in *Bituminous Coal Operators' Association, Inc. v. Secretary of Interior*, 547 F.2d 240 (4th Cir. 1977). The court held that mine construction companies—independent general contractors who perform both surface and sub-surface construction work for mining companies—were subject to regulation under the Coal Act. It also held that the Act could be enforced against either the mine construction companies or the mining companies with respect to violations committed by the construction companies.[43] In summarizing its holding, the court noted that the task was properly the Secretary's to apportion responsibility between the mining companies and the construction companies.[44]

Congress was undoubtedly aware of the concerns about the Secretary's authority to regulate independent contractors under the Coal Act. Reference to independent con-

---

which a violation occurs" (emphasis added) is liable for civil penalties. And by the definitional section of the statute an "operator" of a "coal mine" may be the "owner," and he may be the "lessee," and he may be an *"other* person" (emphasis added). In this context "other person" is to be read *ejusdem generis* to refer to other similar person, "of like kind and character to the designated 'owner[s or] lessee[s] designated.'" In so defining "operator," since the statute employs the general words "other person," following the specific words "owner, lessee," the words "other person" are to be read *ejusdem generis* to refer to other persons of the same class as those enumerated by the specific words. Thus, the other persons must be similar in nature to owners and lessees. That would include independent contractors who operate, control or supervise a "coal mine," as defined in the statute.

Although *Bituminous Contractors* concerned the interpretation of the phrase "other person" in the definition of operator under the Federal Coal Mine Health and Safety Act its rationale also sheds light on the interpretation of the "independent contractor" phrase in the definition of operator under the Mine Act.

**43.** NISA cites *Association of Bituminous Contractors, Inc. v. Andrus*, 189 U.S.App.D.C. 75, 581 F.2d 853 (1978), in support of its position that independent contractors *must* be deemed "operators" under the Mine Act. Neither the rationale nor holding of *Bituminous Contractors* reaches this far, however. Premised on the conclusion that coal mine construction companies "do *control* and *supervise* the construction work they have contracted to perform over the area where they are working," 189 U.S.App.D.C. at 84–85, 581 F.2d at 862–63 (emphasis in original), the court held only that direct liability could permissibly be placed on these independent contractors under the Coal Act. Specific mention was made that the issue "[w]hether *only* contractors can be held liable, is not presented in this case." *Id.* 189 U.S.App. D.C. at 85, 581 F.2d at 863 n. 28 (emphasis in original).

Indeed, in *Republic Steel Corp. v. Interior Board of Mine Operations Appeals*, 189 U.S. App.D.C. 90, 92, 581 F.2d 868, 870 n. 5 (1978), the District of Columbia Circuit stated "we do not disagree with the Fourth Circuit's logic in *Bituminous Coal Operators' Ass'n . . .* that the Act leaves the agency free to assess [liability upon] either coal mine owners or contractors."

*Bituminous Contractors* should provide an analogy suggestive to the Secretary in his current rulemaking concerning the standards to be employed in identifying independent contractors as operators for purposes of the training regulations. Inclusion as operators of those coal mine construction companies which "do *control* and *supervise* the construction work they have contracted to perform" would in all likelihood as *Bituminous Contractors* presages, constitute a reasonable exercise of the Secretary's authority.

**44.** 547 F.2d at 247. The court suggested two theories in support of its holding that a mining company and a construction company are jointly or severally liable under the Coal Act. First, the court concluded that a mining company could be held liable for a construction company's violations "[b]ecause the definition of operator also includes the owner or lessee . . . ." 547 F.2d at 246. Second, the court thought that such liability was proper because "a construction company may be considered the statutory agent of an owner or lessee of a coal mine." *Id.* at 247. We have no occasion to decide today whether this reasoning is equally applicable under the Mine Act. *See Monterey Coal Company v. Secretary of Labor*, Docket Nos. Hope 78–469 to 78–476 (Decision of Administrative Law Judge, Federal Mine Safety and Health Review Commission Feb. 15, 1979).

tractors was apparently made in the Mine Act in order to alleviate these concerns. The Senate Report accompanying the 1977 amendments to the Mine Act states:[45]

> Similarly, the definition of mine "operator" is expanded to include "any independent contractor performing services of construction at such mine." It is the Committee's intent to thereby include individuals or firms who are engaged in construction at such mine, or who may be, under contract or otherwise, engaged in the extraction process for the benefit of the owner or lessee of the property and to make clear that the employees of such individuals or firms are miners within the definition of the Federal Mine Safety and Health Act of 1977. In enforcing this Act, the Secretary should be able to issue citations, notices, and orders, and the Commission should be able to assess civil penalties against such independent contractors as well as against the owner, operator, or lessee of the mine. The Committee notes that this concept has been approved by the federal circuit court in *Bituminous Coal Operators' Assn. v. Secretary of the Interior*, 547 F.2d 240 (C.A.4, 1977).

As this excerpt from the legislative history reveals, independent contractors were included in the definition of "operator" because "the Secretary should be able to issue citations, notices, and orders, and the Commission should be able to assess civil penalties against such independent contractors." Congress was clearly concerned with the *permissive* scope of the Secretary's authority, not with the *mandatory* imposition of statutory duties on independent contractors. Substantial support is lent to this conclusion by the approving reference in the legislative history to the *Bituminous Coal Operators'* case. Judge Butzner's opinion in that case stated plainly that the allocation of liability between mining company and construction company is best left within the province of the Secretary. The Senate Report's citation to *Bituminous Coal Operators'* indicates that allocation of responsibility for training programs between mining companies and independent contractors was also best left to the initiative of the Secretary.

Were we convinced that our analysis of the legislative history suggested an interpretation of the statute at odds with the basic purposes of the Mine Act, we would be somewhat more hesitant in our conclusion. However, an interpretation of the Mine Act that requires mining companies to provide training to employees of independent contractors will aid in implementation of the basic policies underlying the legislation. Employees of independent contractors unschooled in mine health and safety pose a threat to the safety of all persons working at mines. It is not unreasonable for the Secretary to require that their training could be effectively and efficiently provided for by mining companies.[46] Hazards might often exist at a particular mine of which an independent contractor had no knowledge. The mining company, in contrast, would be aware of such hazards and could generally be expected to provide training with respect to conditions at the particular mine. Furthermore, mining companies obligated to provide safety training for their own employees may be able to incorporate employees of independent contractors into their programs more economically than if the independent contractors were themselves required to provide such training. These considerations indicate that the Secretary's regulations are consistent with the policies of the Mine Act. Since the Secretary's definition of "operator" is also supported by legislative history and uncontradicted by statutory text, the policy of deference set forth in *Udall v. Tallman, supra,* leads us to conclude that the Secretary's definition is well within the scope of his statutory authority.

**45.** S.Rep. No. 95–181, 95th Cong., 1st Sess. 14 (1977). *See also* S.Conf.Rep., No. 95–461, 95th Cong., 1st Sess. 37 (1977); U.S.Code Cong. & Admin.News 1977, p. 3414.

**46.** *See* p. 704 -708 *infra.*

■ Little need be said concerning NISA's contention that the definition of "miner" set forth in the regulations is invalid. NISA attacks the Secretary's definition of miner on two grounds: (1) that it is so vague as to fail to provide fair warning of the duties imposed on operators, and (2) that it exceeds statutory authority by requiring training of (a) nonemployees and (b) employees not directly engaged in the extraction process.

The first argument is without merit. Though technical and cumbersome, the definitions are not so vague as to deny fair warning.[47] The second argument faces as a primary obstacle the broad definition of miner set forth in the statute itself: " 'miner' means any individual working in a coal or other mine."[48] As its standard, the statute looks to whether one *works* in a mine, not whether one is an employee or nonemployee or whether one is involved in extraction or nonextraction operations. The Secretary's regulations simply parrot the statutory definition when they state that a miner is one who works in a mine covered by the Mine Act. Although the Secretary's definitions elaborate on this basic standard for purposes of specifying the type of training required, they do not exceed the scope of the statute. This is especially evident when the broad statutory definition of miner is read, as it must be, in conjunction with the statutory definition of "coal or other mine."[49] Nonproduction personnel (those not directly involved in the extraction process) logically fall within the statutory definition of miner, for the definition of "coal or other mine" includes not only the immediate area of mineral extraction, but all lands, means of access, excavations, and equipment ancillary to the extraction process. Persons working in these ancillary areas are persons working in coal or other mines, but they are unlikely to be immediately involved in the production or extraction process.

### B. *Arbitrary and Capricious.*

■ NISA and CCP contest the rationality of the definitional structure set forth in the regulations insofar as mining companies are required to provide training to employees of independent contractors and to those not directly involved in the extraction process. They contend that the regulations must be set aside under section 10(e) of the APA[50] because they are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Although the arguments are somewhat blurred in the briefs, four general objections seem to have been raised: First, the statute was designed to reduce the dangers from mine operations; comprehensive training for employees of independent contractors as well as those not directly involved in the extraction process is superfluous since these persons do not undertake work related to mine operations. Second, mining companies exercise no authority over the employees of independent contractors, and it is therefore unfair to require them to train such employees and to subject them to penalties for violation of safety regulations by such employees. Third, the manpower and other economic burdens from training employees of independent contractors are simply too severe, especially for small surface mines. Fourth, by requiring the operators to provide training, they will be unfairly exposed to liability for the actions of the employees of independent contractors in the areas of tort, tax, workmen's compensation and contract.

In the Supplementary Information issued with the final regulations, the Secretary devotes substantial discussion to these issues.[51] Our review of this discussion indicates that the Secretary gave reasoned consideration to the objections raised by NISA and CCP. Our own analysis convinces us that the Secretary's regulations are not arbitrary and capricious.

---

**47.** *See Grayned v. City of Rockford,* 408 U.S. 104, 108–14, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

**48.** 30 U.S.C. § 802(g).

**49.** *See id.* § 802(h)(1).

**50.** 5 U.S.C. § 706(2)(A).

**51.** *See* Supplementary Information, 43 Fed.Reg. 47454–55, 47458–59.

Two separate facets are included in the first objection raised by NISA and CCP: they object to the obligation of mining companies to train nonemployees and nonproduction personnel, and to the type of training which must be provided. With respect to the training obligation itself, the Secretary concluded that "[s]uch workers [nonproduction personnel], if not given any training, could expose not only themselves but other miners to unnecessary risks." [52]

As to the obligation that mining companies train the employees of certain independent contractors, the Secretary made the following observations: [53]

Nothing in the Mine Act removes from the operator the primary responsibility for the health and safety of all miners on mine property. The operator has control not only over his own employees but either directly or indirectly, over those with whom he contracts and allows to perform work on mine property. The operator remains ultimately responsible for, and is the beneficiary of all work done at the mine. Moreover, in the specific area of training, an operator can best assure that all miners working at his mine receive systematic training consistent with the health and safety needs and conditions existing at the mine. Accordingly, except with respect to those independent contractors that may be identified as operators under rules currently being developed, operators will be primarily responsible for training workers on mine property.

These statements identify the basic policies underlying the Secretary's decisions relating to the definitional structure of the regulations. These policies, in turn, are consonant with the remedial purposes underlying the Mine Act. We think that they provide a sufficient reasoned predicate in support of the regulations. [54]

Insofar as NISA and CCP object to the type of training for nonemployees required by the regulations, we note that the Secretary's dual definition of miner is designed to equate the type of training required to the degree of risk to which a particular type of miner is exposed. Comprehensive training is required only for "those persons most directly and regularly exposed to mining hazards . . . ." [55] Other workers at the mine, "exposed to certain mine hazards on a less regular basis in performing duties ancillary to or supportive of extraction or production," [56] are required to receive only hazard training—training designed to alert to the hazards endemic in a mine environment. [57] The Secretary contemplates that hazard training "should not generally require classroom instruction and may often consist of an instructional sheet distributed to the worker containing a checklist of hazards" [58] On its face, we cannot say that the Secretary's

---

**52.** *Id.* at 47455.

**53.** *Id.*

**54.** Although we conclude that the general definitional framework established by the Secretary is not arbitrary and capricious, we note that we are not called to pass upon specific cases in which mining companies are directed by the Secretary to provide training to the employees of independent contractors. Both NISA and CCP pose the extreme hypothetical of small mining companies required to provide extensive training to the employees of specialized independent contractors when the very purpose for which the contractors were hired was their specialized skills and abilities. We are not untroubled by this prospect. But we think that these issues are not now before us for review, and we believe that such concerns can be adequately accommodated in the Secretary's current rulemaking endeavors which pertain to the standards to be employed in designating independent contractors as operators.

In response to a point raised by CCP, we note that the regulations requiring compensation for miners receiving training, 30 C.F.R. §§ 48.10, 48.30, do not necessarily require that this compensation be paid by the operators providing training (as opposed to the employers of the miners). These regulations have not been challenged in this proceeding, and we express no further view on their interpretation.

**55.** Supplementary Information, 43 Fed.Reg. 47454, 47455 (1978).

**56.** *Id.*

**57.** *See* 30 C.F.R. §§ 48.11, 48.31.

**58.** Supplementary Information, 43 Fed.Reg. 47454, 47455 (1978).

approach—requiring more extensive training for those exposed to greater risks—is arbitrary and capricious.

NISA and CCP attack not the concept of equating the type of training to the degree of risk, but the manner in which that concept has been applied by the Secretary. This challenge, however, ignores the fact that there is room for flexibility in the designation of those persons for whom comprehensive training is required. For the time being, the Secretary has apparently chosen to administer this aspect of the training regulations on a case by case basis. It may be that in a particular case the Secretary's requirement that the employees of certain independent contractors receive comprehensive training will be unreasonable. So also, there may be a time when the Secretary takes an unreasonable view as to who is "regularly exposed to mining hazards." Such applications of the standards established in the regulations may be judicially reviewed in enforcement proceedings. The standards themselves, which are the only aspect of the regulations now before us for review, are not arbitrary and capricious.[59]

■ Although the Secretary does not respond directly to the second argument advanced by NISA and CCP—that mining companies have no authority over employees of independent contractors—the failure to do so is harmless since the argument is really a nonsequitur. That the mining companies have no supervisory authority over the employees of independent contractors when they are working at the mine site does not mean that they should be freed from training such employees. Such training may still be justified, as the Secretary argues, on grounds of economy and the mining companies' greater knowledge of hazardous mining conditions. Moreover, that the mining companies must provide

such training does not mean that the independent contractors will be freed from liability for noncompliance with other Mine Act health and safety standards. *See Association of Bituminous Contractors, Inc. v. Andrus*, 189 U.S.App.D.C. 75, 581 F.2d 853 (1978); *Bituminous Coal Operators' Association, Inc. v. Secretary of Interior*, 547 F.2d 240 (4th Cir. 1977).

■ The third argument raised by NISA and CCP focuses on the economic burdens resulting from the training requirements, for these regulations will surely engender some economic hardships and financial problems. A four-fold response is offered to this objection by the Secretary: (1) the burdens are minimized by the distinction between comprehensive and hazard training; (2) the burdens are reduced to the extent that the same training can be given to the mining company employees and employees of independent contractors; (3) mining companies can further reduce these burdens by contracting with "experienced" independent contractors, whose employees will require less training; (4) the distribution of economic burdens entailed in the training programs was a matter accepted and imposed in the Mine Act itself, and the regulations do no more than follow the Mine Act in this regard.

The Secretary's response largely stands on its own. Fairly full discussion is devoted to the economic burdens issue in the Supplementary Information issued with the regulations.[60] This discussion is sufficient to indicate that there has been a ventilation of the issues and that the agency reacted as it did for specific reasons. *See Automotive Parts & Accessories Association v. Boyd*, 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). Relevant legislative history indicates, in addition, that Congress believed compliance burdens would be largely offset by the benefits from increased miner safety

---

**59.** The Secretary suggested, by way of example, that hazard training may be sufficient for "scientific, office, or delivery personnel, either employed or contracted by the operator, or short term maintenance or service personnel contracted by the operator". Supplementary

Information, 43 Fed.Reg. 47454, 47455. We express no view as to the application of the comprehensive-hazard training distinction to these groups of workers.

**60.** 43 Fed.Reg. 47454, 47458–59.

attributable to the training requirements.[61] These factors, coupled with the presumptive validity to which the regulations are entitled, *see Udall v. Tallman, supra,* lead us to conclude that the economic burdens are not so severe as to make the regulations at issue arbitrary and capricious.

■ We are unmoved by the fourth argument advanced by NISA and CCP—that providing training by mine companies to employees of independent contractors will unfairly expose the mine companies to new areas of liability with respect to these employees. Aside from a recitation of their own speculations, NISA and CCP cite no authority which would indicate that merely providing training to employees of independent contractors, pursuant to regulations promulgated by the Secretary and in courses approved by MSHA, would increase their exposure to liability. The Secretary's regulations are not made arbitrary and capricious merely by such speculation.

For the foregoing reasons, we conclude that the Secretary's regulations defining the terms "miner" and "operator" are not arbitrary, capricious, an abuse of discretion or otherwise unauthorized by law.

### IV. MSHA APPROVAL OF INSTRUCTORS.

NISA contends that the requirement that instructors in safety training be approved by MSHA is arbitrary, capricious, and beyond the scope of statutory authority. This requirement, for the training and retraining of miners in underground mines, is set forth in 30 C.F.R. §§ 48.3(g), 48.23(g). Various means by which instructors may receive MSHA approval are specified in 30 C.F.R. §§ 48.3(h), 48.23(h).

### A. Scope of Statutory Authority.

■ As statutory authority supporting promulgation of the instructor approval regulations, the Secretary cites section 115(a) of the Act,[62] which provides in part that "[e]ach operator of a coal or other mine shall have a health and safety training program which shall be approved by the Secretary." As is evident from this statutory text, there is no express statutory authorization for the promulgation of regulations requiring MSHA approval of instructors. The fact that training programs must be approved by the Secretary does not mean that instructors must necessarily be approved as well. But neither is there any express authority precluding such a construction of the statute. If this issue were to be decided only on the basis of textual support in the statute for the challenged regulations, this state of equipoise would require a decision in favor of the Secretary because of the presumptive validity of the regulations. *See Udall v. Tallman, supra.*

NISA goes beyond the statutory text, however, and cites material from the legislative debates intended to show that the cost of the instructor approval program will be far in excess of that intended by Congress. Directing our attention to an estimate by Senator Williams that the total cost of the training program would be $43,-000,000.[63] NISA then states that "MSHA's

---

**61.** In the regulatory and paperwork impact statement included in the Senate Report, the following cost assessment appears:

The cost to the industry of complying with new standards which may be promulgated by the Secretary is difficult to estimate. The Committee believes that, in most instances, operators will be able to comply with standards by altering existing mining operations at minimum cost. The Committee also firmly believes that any cost outlay necessary to comply with standards will be made up with increased productivity and reduced compensation in event of death, injury or disability.

S.Rep. No. 95–181, 95th Cong., 1st Sess. 58 (1977); U.S.Code Cong. & Admin.News 1977, p. 3457.

Although this sort of analysis does not identify the parties who will bear the costs and benefits of the legislation and regulations, the mining companies will undoubtedly benefit to a significant degree by the improved safety records of the independent contractors with whom they deal.

**62.** 30 U.S.C. § 825(a).

**63.** *See* Subcomm. on Labor of the Comm. on Human Resources, 95th Cong., 2d Sess., Legis-

estimate of the cost of the approved program is almost $15 million, or 33 percent more than Senator Williams's cost for the entire training program.[64] First, it is obvious that MSHA's $15 million estimate is 33 percent *of*, not *more than*, Senator Williams's projection. Second, although no specific reference is made in the debates to instructor approval procedures, there is no specific breakdown of the $75 per training day per miner figure, on which Senator Williams's overall estimate was based, that would indicate that instructor approval was not contemplated.[65] Finally, the State Report itself recognized that "[t]he cost to the industry of complying with new standards which may be promulgated by the Secretary is difficult to estimate." [66] In conjunction with this, the Secretary makes the argument, not without some force, that the Senate rejected two amendments which would have required the preparation of economic impact analyses on all standards and regulations established by or under the Mine Act, thus evidencing that cost *per se* was not to be a barrier to promulgation of the regulations. For these reasons, we think that the various cost estimates concerning the training regulations are too nebulous to be given dispositive weight in the evaluation of the Secretary's regulations.[67] Furthermore, we think that the requirement of the MSHA-approved instructors is consonant with the purposes of the Mine Act in that it will assure that miners receive effective training. Since the instructor approval regulations are not pre-

cluded by the text or legislative history of the Mine Act, and since they are in accord with Mine Act's basic policies, we hold that they are within the scope of the Secretary's statutory authority.

### B. *Arbitrary and Capricious.*

█ NISA posits that we must invalidate the Secretary's instructor approval regulations for three reasons. First, debate by the Advisory Committee was allegedly stifled because of statements made by MSHA representatives. Second, NISA contends that no reasons were suggested by the Secretary in support of a requirement of instructor approval. Third, it is claimed that the requirement is unduly burdensome, especially for small operators.

At the outset, our review of the relevant transcripts of the Advisory Committee proceedings does not convince us that debate on this issue was in any material respect stifled.[68] The Secretary himself gave extensive consideration to the other objections raised by NISA and other commentators.[69] At least three reasons are set forth in the Supplementary Information justifying the instructor approval regulations. First, MSHA approval will insure that instructors know the subject matter which they are to teach. Second, it will insure that the instructors are effective teachers. Third, no viable alternative means of overseeing the instruction process was suggested. Although NISA contends that it would be

lative History of the Federal Mine Safety and Health Act of 1977, at 945 (1978). [hereinafter cited as Leg.Hist.]

**64.** Brief for Petitioner NISA at 54.

**65.** *See* Leg.Hist., *supra* note 63, at 943–47.

**66.** S.Rep. No. 95–181, 95th Cong., 1st Sess. 58 (1977); U.S.Code Cong. & Admin.News 1977, p. 3457.

**67.** NISA also quotes a statement made by Senator Javits indicating that the cost-benefit analysis may be a factor in determining whether the regulations are arbitrary and capricious. *See* Leg.Hist., *supra* note 63, at 950–51. In suggesting such a standard, Senator Javits appeared to have in mind certain court decisions which may have evaluated OSHA standards

under a cost-benefit analysis. This court has evaluated OSHA orders under a "financial viability" test, *see American Iron and Steel Institute v. OSHA*, 577 F.2d 825 (3d Cir. 1978), *petition for cert. filed*, 47 U.S.L.W. 3422 (U.S. Jan. 19, 1978) (78–919), and this choice of analysis was approved for purposes of reviewing standards dealing with toxic substances, *see* S.Rep. No. 95–181, 95th Cong., 1st Sess. 21–22 (1977). NISA does not contend that implementation of the instructor approval regulation would threaten the financial viability of the mining industry.

**68.** *See* App. 352–55, 364, 532–33.

**69.** Supplementary Information, 43 Fed.Reg. 47454, 47456.

sufficient if "competent" persons were required to provide training, it does not indicate how competency should be measured (unless the Secretary were simply to accept the appraisal of the mine operator, an alternative which we think the Secretary could properly reject).

There is no doubt that the instructor approval requirement will be burdensome, especially for small operators. It cannot be said that the Secretary was oblivious to this problem, however, for he has endeavored to accommodate small operators by providing for various means of instructor approval. Many instructors have been "grandfathered in," [70] and provision has been made for MSHA approval based solely upon qualifications and teaching experience.[71] In addition, MSHA has indicated that in some circumstances approval can be based upon MSHA observation of classes actually taught.[72] Also, MSHA is encouraging cooperation among mine operators and others in the establishment of training programs.[73] By these various provisions, we think that the Secretary has built sufficient flexibility into the program to accommodate in a reasonable manner the interests of small operators.

For the foregoing reasons, we conclude that the Secretary's regulations requiring MSHA approval of instructors are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## V. REQUIREMENT OF PRE–WORK TRAINING.

NISA contends that the regulations which require certain levels of pre-work training for inexperienced miners are arbitrary, capricious, and beyond the scope of statutory authority. Underground miners are required to receive at least forty hours of training before being assigned to work duties.[74] Miners working at surface mines and surface areas of underground mines are required to receive pre-work training as follows: [75]

(a) Each new miner shall receive no less than 24 hours of training as prescribed in this section. Except as otherwise provided in this paragraph, new miners shall receive this training before they are assigned to work duties. At the discretion of the Chief of the Training Center, new miners may receive a portion of this training after assignment to work duties: Provided, that no less than 8 hours of training shall in all cases be given to new miners before they are assigned to work duties. The following courses shall be included in the 8 hours of training: Introduction to work environment, hazard recognition, and health and safety aspects of the tasks to which the new miners will be assigned. Following the completion of this preassignment training, new miners shall then receive the remainder of the required 24 hours of training, or up to 16 hours, within 60 days. Operators shall indicate in the training plans submitted for approval whether they want to train new miners after assignment to duties and for how many hours. In determining whether new miners may be given this training after they are assigned duties, the Training Center Chief shall consider such factors as the mine safety records, rate of employee turnover and mine size. Miners who have not received the full 24 hours of new miner training shall be required to work under the close supervision of an experienced miner.

### A. Scope of Statutory Authority.

■ NISA is on thin ground in claiming that these regulations are beyond the scope of statutory authority. Section 115(a) of

70. *See* Brief for Petitioner NISA at 53.

71. 30 C.F.R. §§ 48.3(h)(2), 48.23(h)(2).

72. *Id.* §§ 48.3(h)(3), 48.23(h)(3).

73. *Id.* §§ 48.4, 48.24.

74. 30 C.F.R. § 48.5.

75. *Id.* § 48.5(a); *see id.* § 48.5(b)–(d).

the Mine Act [76] provides strong textual support for the type of pre-work training required in the regulations:

. . . . .

> Each training program approved by the Secretary shall provide as a minimum that—
>
>> (1) new miners having no underground mining experience shall receive no less than 40 hours of training if they are to work underground. Such training shall include instruction in the statutory rights of miners and their representatives under this chapter, use of the self-rescue device and use of respiratory devices, hazard recognition, escapeways, walk around training, emergency procedures, basic ventilation, basic roof control, electrical hazards, first aid, and the health and safety aspects of the task to which he will be assigned;
>>
>> (2) new miners having no surface mining experience shall receive no less than 24 hours of training if they are to work on the surface. Such training shall include instruction in the statutory rights of miners and their representatives under this chapter, use of the self-rescue device where appropriate and use of respiratory devices where appropriate, hazard recognition, emergency procedures, electrical hazards, first aid, walk around training and the health and safety aspects of the task to which he will be assigned . . . .

The grammatical structure of the statute— "shall receive . . . training if they are to work . . .," "training shall include instruction in . . . the health and safety aspects of the task to which he will be assigned"—suggests that the training is to be administered prior to the assignment of work duties.

Relevant legislative history also supports the view that pre-work training is statutori-ly authorized. Portions of the floor debate indicate the concern of Senators that a disproportionate number of mine accidents are caused by inexperienced miners.[77] NISA contends that the requirement in the regulations usurps the authority of mine operators in formulating their own training programs, see 30 U.S.C. § 825(a), but this simply ignores the fact that such plans must be formulated within the confines of statutory strictures. In view of the statutory text and legislative history, we are satisfied that the regulations are within the scope of the Secretary's statutory authority.

### B. *Arbitrary and Capricious.*

NISA contends that the pre-work training requirements are arbitrary and capricious primarily insofar as they are burdensome on small operators. Responding to this objection in great detail, the Secretary concluded that pre-work training was necessary to preserve the safety of miners, but that the burden on small surface operators was sufficiently great that in appropriate cases only eight hours of pre-work training would be required.[78] The balancing which resulted in this compromise is particularly within the ken of the Secretary. From our perspective, it is difficult to conclude that a requirement of one day's training is so unreasonably burdensome as to become arbitrary and capricious. If individual Training Center Chiefs fail to exercise their discretion to minimize the pre-work training requirement in appropriate cases, review of such determinations can always be had on a case-by-case basis.

### VI. APPLICATION OF REGULATIONS TO DREDGING INDUSTRY.

NISA has challenged the extension of coverage of the Secretary's regulations to dredging operations, contending that such extension is arbitrary, capricious, and beyond the scope of statutory authority. It bases this challenge on a statement con-

---

**76.** 30 U.S.C. § 825(a). For the full text of § 825(a), see pp. 694‑695 *supra.*

**77.** *See* 123 Cong.Rec.S. 10254 (daily ed. June 21, 1977) (Remarks of Senator Williams). *See*

*also* S.Rep. No. 95–181, 95th Cong., 1st Sess. 49–50 (1977).

**78.** 43 Fed.Reg. 47454, 47455–56.

tained in the Supplementary Information filed with the regulations which expresses the Secretary's view as to the scope of coverage of the Mine Act: [79]

b. *Coverage of the rules.* These rules are applicable to all facilities which are covered under the Mine Act. MSHA does not have the authority to exempt or exclude operations otherwise covered by the Act from the training requirements. Thus, milling, dredging, and clay winning operations are subject to these requirements. MSHA is aware that the scope of the Mine Act and these rules is broad and that each type of operation may have unique safety and health problems. MSHA encourages operators to contact MSHA's training centers in order to discuss the type of operations involved and the type of training program which may be appropriate to meet the needs of the workers at that operation.

The regulations themselves, however, do not address the scope of coverage of the Mine Act. They simply state that they set forth "the mandatory requirements for submitting and obtaining approval of programs for training and retraining miners working at underground mines" [80] and "miners working at surface mines and surface areas of underground mines." [81] Although the term "miner" is defined in the regulations, the term "mine" is not. Presumably the Secretary intends that the term "mine" in the regulations conform precisely in meaning with the term "mine" as it is defined in

the statute.[82] In effect, the issue that NISA seeks to raise is whether the statutory definition of "mine" will permit the Secretary to enforce the regulations he has promulgated against dredging operations.

Section 101(d) of the Mine Act provides for judicial review of "mandatory health or safety standard[s] promulgated under [section 101]." [83] Application of the regulations to "underground mines" and "surface mines and surface areas of underground mines" is no doubt reviewable under section 101(d) because the scope of coverage has been expressed in these terms by regulations promulgated pursuant to section 101. However, NISA does not challenge the scope of coverage of the regulations insofar as it is defined in these terms.[84] Rather, NISA objects to the application of these regulations to the dredging industry. We do not think that the Secretary's mere expressed intention, set forth only in the Supplementary Information, to apply these regulations to the dredging industry amounts to a "mandatory health or safety standard promulgated under [section 101]" such as to be reviewable under section 101(d).[85] None of the detailed procedural requirements for development and promulgation of mandatory health and safety standards, as set forth in section 101 of the Mine Act,[86] have been followed with respect to the Supplementary Information issued by the Secretary. The Supplementary Information statement is not published in the *Code of Federal Regulations*, and is not itself binding on persons

**79.** Supplementary Information, *Id.* at 47456–57.

**80.** 30 C.F.R. § 48.1.

**81.** *Id.* at § 48.21.

**82.** 30 U.S.C. § 802(h)(1).

**83.** *Id.* § 811(d).

**84.** Nor do we think, in appraising these terms on their face, that such a challenge would be likely of success.

**85.** The Supplementary Information issued by the Secretary was designed to comply with the APA requirement that "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

We do not hold that such statements may never be reviewed during the course of review of agency rulemaking. Perhaps in certain circumstances such statements, standing alone or read in conjunction with the rules actually issued, would have a purpose or effect such as to make it appropriate to treat them as rules for purposes of review. This is not such a case, however.

**86.** 30 U.S.C. § 811.

These procedural requisites facilitate judicial review by encouraging a full record of comments, alerting the agency to trouble areas in proposed regulations, and requiring of the agency a reasoned explanation of the course it has chosen to pursue.

subjected to the Secretary's regulations.[87] Moreover, forceful reasons counsel that an "as applied" challenge, such as NISA has pleaded, should be raised during the course of an enforcement proceeding.[88] We must review the Secretary's regulations based on the record compiled during the notice and comment rulemaking. Little factual background concerning the dredging industry has been presented in this record, and the industry is one with which we have no great familiarity. As a consequence, we are really in no position to assess whether the application of these regulations to the dredging industry would be unreasonable or in any way inconsistent with the provisions of the Mine Act. For these reasons, we hold that the Secretary's expressed intention to apply these regulations to the dredging industry does not itself constitute a "mandatory health or safety standard promulgated under [section 101]" such that it is properly before us for review in this proceeding.[89]

## VII. NEW MINER TRAINING.

■ CSM is dissatisfied with the regulations prescribing the training regimen for new surface and underground miners.[90] With respect to surface miners, it objects that "there is no requirement in the regulations that new miners in surface mines receive training on training faces."[91] This omission is said to make the regulations arbitrary, capricious, and violative of statutory requirements. The regulation pertaining to training for new underground miners is similarly claimed to be invalid "because it fails to establish explicit guidelines for the development and use of training facilities which duplicate actual underground conditions, and because it fails to provide objective criteria for the approval of such facilities."[92]

### A. Statutory Authority.

The statute requires as a minimum that a new miner having no underground mining experience shall receive instruction "in the statutory rights of miners and their representatives . . ., use of the self-rescue device and use of respiratory devices, hazard recognition, escapeways, walk around training, emergency procedures, basic ventilation, basic roof control, electrical hazards, first aid, and the health and safety aspects of the task to which he shall be assigned . . ."[93] A new miner having no surface mining experience must receive similar

---

**87.** Cf. Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969) (agency's general policy statement exempted from rulemaking requirements of 5 U.S.C. § 553 because no rights and obligations created by such statement.)

**88.** See 30 U.S.C. § 816 (judicial review of orders of the Federal Mines Safety and Health Review Commission. Cf. Lucas Coal Company v. Interior Board of Mine Operations Appeals, 522 F.2d 581 (3d Cir. 1975) (ruling by Board of Mine Operations Appeals that regulation promulgated pursuant to Federal Coal Mine Health and Safety Act of 1969 includes bulldozers within its coverage constitutes an interpretation of an administrative regulation subject to review in an enforcement proceeding).

**89.** The Secretary has argued before us that the application of the regulations to the dredging industry is an issue not properly subject to review at this time, but has couched this argument in terms of NISA's failure to exhaust administrative remedies. Although NISA has challenged the applicability of the regulations to the dredging industry at this time, it has done so primarily in order to preserve this issue for review. See 30 U.S.C. § 811(d). The consequence of our ruling is that the dredging industry issue may properly be argued before the agency in an enforcement proceeding. Such a challenge will not involve a forbidden collateral attack on a health or safety standard, but a permissible issue of interpretation.

**90.** The regulations containing the training requirements for new surface miners are set forth at 30 C.F.R. § 48.25. Those concerning new underground miners are set out at 30 C.F.R. § 48.5.

**91.** Brief for Petitioner CSM at 22. While the term "training faces" is not used in the Mine Act, it is apparently employed by CSM to refer to training in mock mine facilities or in special training sections of actual mines.

**92.** Id. at 26.

**93.** 30 U.S.C. § 825(a)(1).

instruction.[94] Any training required for new surface or underground miners "shall include a period of training as closely related as practicable to the work in which the miner is to be engaged." [95]

Typical of statements in the legislative history reflecting a concern that training be undertaken in conditions simulating actual working conditions is the following excerpt from the Conference Report: [96]

The conference substitute contains an amendment which requires the Secretary's regulations dealing with mandatory health and safety training to provide that to the extent practicable, the formal training required of miners include a period to be conducted in circumstances which as closely as possible duplicate actual underground or surface mining facilities. The conferees were impressed by testimony received by both the Senate and the House subcommittees relating some operator training programs which included nonoperating sections of actual underground or surface mines. It is the conferees' belief that training in such facilities is vastly more beneficial to the understanding of miners of the dangers which they will confront than classroom training, and the conference substitute requires that the Secretary's regulations require such training facilities to the extent practicable. The conferees also recognize and endorse training under actual production conditions where such conditions may be essential to the training experience. The conferees state their intention, however, that while training in mock mine facilities, in non-working sections, or in actual production conditions be encouraged, "on-the-job training" is not contemplated. The conferees are aware that many small operators may find it beyond their individual capabilities to provide such training facilities, and that therefore, each operator should not be independently required to maintain such training facilities.

We may quickly dispose of the claim that the training requirements for new underground miners fail to satisfy statutory norms. 30 C.F.R. § 48.5 specifically states that new miner training "shall be conducted in conditions which as closely as practicable duplicate actual underground conditions, and approximately 8 hours of training shall be given at the minesite." The fact that the regulation does not specifically require training at "training faces," as CSM contends it should, does not mean that statutory requirements are not satisfied. Rather, this fact merely suggests a disagreement between CSM and the Secretary about the best means of simulating actual mine conditions. Since no requirement is set forth in the statute or legislative history that instruction be provided on "training faces", and since the Secretary's regulation largely tracks the language of the statute, we think that the regulation does not improperly depart from statutory standards. Even if the Secretary's regulation does not establish explicit standards for training in actual mine conditions, we are satisfied that program implementation can be adequately supervised when the training plans of individual operators are submitted for MSHA approval. Supervision through this means is consonant with the flexibility with which Congress intended this aspect of the training regimen to be administered.

The regulations with respect to surface mines require that training include an introduction to work environment, instruction on the highwall and ground control plans in effect at the mine, and instruction on the health and safety aspects of the tasks to which new miners will be assigned.[97] Where appropriate, these aspects of the required training can be expected to be close-

---

**94.** *Id.* § 825(a)(2).

**95.** *Id.* § 825(a)(5).

**96.** S.Conf.Rep. No. 95–461, 95th Cong., 1st Sess. 62–63 (1977); U.S.Code Cong. & Admin. News 1977, p. 3510.

**97.** The mandatory eight hours of pre-work training must include an introduction to work environment, hazard recognition, and health and safety aspects of the tasks to which new miners will be assigned. 30 C.F.R. § 48.25(a).

ly related to the work in which surface miners are to be engaged. No more than this is required by the statute. As we have previously indicated training on "training faces," while much may be said to recommend it is certainly not mandated by the statute. Practicability is the touchstone of the legislative requirement of work-related training. Aware that "many small operators may find it beyond their individual capacities to provide [work-related] training facilities," [98] the congressional conferees did not intend that each operator be required to maintain such facilities. Work-related training, rather, is to be required "to the extent practicable." [99] In our view, the Secretary's regulation pertaining to the training of surface miners fulfills these statutory requirements.[100] Although instruction on "training faces" is not required, instruction must be provided with respect to the work environment and tasks of new surface miners. In approving individual plans, the Secretary will be able to compel work-related training where such training is appropriate.

### B. *Arbitrary and Capricious.*

CSM contends that the regulations are arbitrary and capricious because they fail to satisfy the statutory requirements for new miner training. As we have discussed above, we are of the view that the regulations do comport with statutory standards. We also think that the Secretary's choice of training courses and methods of instruction,

as developed in the regulations and Supplementary Information, is not unreasonable. While the Secretary may well find it fruitful to study further the "training face" concept, his failure to promulgate regulations incorporating in detail this concept is not arbitrary and capricious.

### VIII. NEW TASK TRAINING FOR EXPERIENCED MINERS.

■ In a related argument, CSM urges that the regulations prescribing new task training [101] for experienced miners are in conflict with the Mine Act [102] because they allow training during production periods and do not require training on "training faces". We have previously discussed and disposed of the issue respecting training on "training faces" for inexperienced miners, and for similar reasons we find no conflict between the Secretary's regulations and the Mine Act insofar as training on "training faces" is not required for experienced miners.

New task training must include supervised training in the assigned task during nonproduction periods or training in the assigned task, "under direct and immediate supervision," during production periods.[103] CSM contends that this requirement is tantamount to "on-the-job training", and that such training is precluded because of certain statements in the legislative history of the Mine Act.[104] We do not read the regu-

---

**98.** S.Conf.Rep. No. 95–461, 95th Cong., 1st Sess. 63 (1977); U.S.Code Cong. & Admin. News 1977, p. 3511.

**99.** *Id.* at 62.

**100.** CMS buttresses its argument with the observation that the regulations governing new miner training in surface mines, in contrast to the regulations governing such training in underground mines, do not track the provisions of the statute calling for a period of work-related training to the extent practicable. *Compare* 30 C.F.R § 48.5(a) *with* § 48.25(a). We do not find this distinction to be of significance, given that the regulations, read as a whole, are consistent with the statutory requirements.

**101.** The regulations concerning new task training for experienced miners are set forth at 30 C.F.R. §§ 48.7, 48.27.

**102.** Minimum statutory requirements for new task training are established in 30 U.S.C. § 825(a)(4).

**103.** 30 C.F.R. §§ 48.7(a)(2), 48.27(a)(2).

**104.** CSM, Brief for Petitioner CSM at 47, calls our attention to the following two sentences from the Conference Report:

The conferees also recognize and endorse training under actual production conditions where such conditions may be essential to the training experience. The conferees state their intention, however, that while training in mock mine facilities, in non-working sections, or in actual production conditions be *encouraged, "on-the-job training"* is not contemplated.

lations to permit mine operators to provide new task training in a way that would permit miners to be trained while actually engaging in normal production activities. Rather, the regulation specifies that training during production periods shall be given under the "direct and immediate" supervision of a qualified trainer or supervisor and shall cover "operation of the machine or equipment and the performance of work duties." 30 C.F.R. § 48.27(a)(2)(ii). The supervision requirements of the regulation will insure that new task training during production periods will meet the congressional concern that training be conducted "under actual production conditions where such conditions may be essential to the training experience," while not permitting the experienced miner to be assigned new duties with the expectation that he will eventually train himself "on the job." [105]

## IX. RIGHTS OF MINERS.

CSM contends that the training regulations are inconsistent with the statute, and arbitrary, capricious, and an abuse of discretion because; (1) they fail to enumerate the statutory rights conferred on miners, and (2) they fail "to meaningfully identify and explain to miners their rights and accompanying protections." [106] As part of its second contention, CSM also contends that the regulations are invalid because they fail to provide for a method by which miners' rights will be effectively exercised.

### A. *Scope of Statutory Authority.*

 We find no merit to CSM's argument insofar as it is based on the Secretary's alleged failure to comply with the directives of the statute. The minimum statutory requirements for training programs are set forth in section 115(a) of the Mine Act.[107] Neither the statute nor the legislative history requires that the Secretary include in the regulations required by section 115(a) an enumeration of miners' rights or a description of the means by which those rights might be utilized.[108] It is required by the regulations that the training program "include instruction in the statutory rights of miners and their representatives under the Act, including a discussion of Section 2 of the Act . . . . [109] This, to our view, is consistent with statutory requirements and provides room for flexible and individualized application of statutory standards when specific training program plans are submitted to MSHA for approval.

### B. *Arbitrary and Capricious.*

 In response to concerns that the content of the miners' rights course was unduly vague, the Secretary responded as follows: [110]

i. Content of miners' rights course. Several commenters were uncertain over the content of the course covering miners' rights. MSHA is providing and will continue to provide assistance in the development of a course that will deal with

---

This portion of the Conference Report is set forth in greater detail at p. 713 *supra*; U.S. Code Cong. & Admin.News, 1977, p. 3510.

**105.** Furthermore, we do not think that the Secretary's regulation is arbitrary and capricious. It is not unreasonable to conclude that experienced miners assigned to new tasks would be well adapted to supervised training during production periods. The fact that production period training must be "under *direct* and *immediate* supervision," 30 C.F.R. § 48.7(a)(2)(ii), provides sufficient assurance that such training will not be merely a smokescreen for the neglect of experienced miners assigned to new tasks.

**106.** Brief for Petitioner CSM at 31.

**107.** 30 U.S.C. § 825(a). *See* pp. 694–695, *supra.*

**108.** The Mine Act does prohibit discrimination against miners who exercise their statutory rights. 30 U.S.C. § 825(c). *See* S.Rep. No. 95–181, 95th Cong., 1st Sess. 35 (1977). In view of the defernce to which the Secretary is entitled in his construction of the Mine Act, we will not strain to extend this prohibition against discrimination by mine operators into an affirmative obligation on the part of the Secretary to enumerate or catalogue mechanistically, in the training regulations, the rights of miners.

**109.** 30 C.F.R. §§ 48.5(b)(1), 48.25(b)(1).

**110.** 43 Fed.Reg. 47454, 47457.

the statutory rights of miners. This course will be available to the operator and instructors and provide them with the content necessary to teach the course and provide sufficient information to the miners. In addition, MSHA's Office of Information is also in the process of developing a pamphlet dealing with the same subject.

Through both of these sources and through others who may develop materials on the same subject, MSHA believes that adequate information will be provided for clarification of course content. This does not, however, preclude the operator from developing his own materials should he feel the need to do so.

We think that the Secretary's decision to proceed through preparation of a course on miners' rights and through preparation of a pamphlet, to be made available to miners, discussing those rights is a reasonable one. The Secretary could well conclude that a pamphlet explaining the rights of miners would be far more effective than a mere listing of such rights in regulations designed for publication in the Code of Federal Regulations.[111] Without denigrating the extent to which miner participation will be helpful in enforcing the Mine Act, we also think that the Secretary's requirement that all training program plans be submitted to MSHA for approval[112] provides a reasonable means of ensuring effective utilization of miners' rights. MSHA will approve plan content as well as training instructors.[113] Moreover, operators will be subject to routine inspection of their training plans, as well as to inspection at the request of miners who believe that inadequate training is

being provided.[114] For these reasons, we hold that the Secretary's regulations are not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

## X. PROCEDURAL COMPLIANCE WITH MINE ACT AND APA.

 CSM argues generally that the Secretary has not complied with the procedural requirements of the Mine Act and the APA because he has failed to consider and comment adequately on the criticisms of the regulations proffered by CSM. In framing this argument, CSM relies on section 101(a)(4)(A) of the Mine Act[115] and section 4(b) of the APA,[116] both of which require a statement of the reasons and purpose for the regulations promulgated.

In appraising the adequacy of the explanation set forth in the Secretary's Supplemental Information, "[w]e do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rule making."[117] Rather, we must appraise the adequacy of the statement of reasons in light of the principal functions which the statement is intended to serve. The statement of reasons requirement is preeminently a means of holding the agency accountable for administering the laws in a responsible manner—accountable to the Congress which enacted the laws and to the courts which must review the agency's action. Also, the statement of reasons assures those subject to the agency's authority that they are not being victimized by senseless or corrupt government action. If an agency can articulate sound

111. CSM has apparently participated, through the submission of comments, in the preparation of the pamphlet to be made available to miners. Brief for Respondent at 36.

112. 30 C.F.R. §§ 48.3, 48.23.

113. Id. §§ 48.3(e), (g), 48.23(e), (g).

114. 30 U.S.C. § 813.

115. 30 U.S.C. § 811(a)(4)(A). This section provides that " . . . the Secretary shall by rule promulgate, modify, or revoke such mandatory

health or safety standards, *and publish his reasons therefor* " (emphasis added).

116. 5 U.S.C. § 553(c). This section provides in part that "[a]fter consideration of the relevant matter presented, *the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose*" (emphasis added).

117. *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). *See* K. C. Davis, Administrative Law of the Seventies § 6.01–2 at 172 (1976).

reasons for its decisions, this is a great assurance that it is not acting arbitrarily or irrationally.[118]

We think that the reasons set forth by the Secretary in support of the training regulations as promulgated are sufficient to satisfy the requirements of the Mine Act and the APA. They have "enable[d] us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." [119] Even though the Secretary has not responded directly to all of the issues raised by CSM, we would not interpret the Mine Act or the APA in such a way as to require him to do so. Rather, we have satisfied ourselves that the explanation offered in support of the policy choices made by the Secretary is sufficient to assure that the Secretary undertook his task in a responsible manner and that the training regulations are not arbitrary and capricious. We therefore conclude that the procedural requirements of the Mine Act and the APA were fully satisfied.

## XI. CONCLUSION.

Because we do not think that the issue is properly before us for review at this time, we express no view as to the applicability of the Secretary's training regulations to the dredging industry. Any challenge to the applicability of these regulations to the dredging industry must await enforcement proceedings. In all other respects, we will uphold the validity of the regulations challenged in this review proceeding and dismiss the petitions of NISA and CSM.

---

118. *See Rodway v. Dep't of Agriculture*, 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975); *Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 450–51, 564 F.2d 458, 471–72 (1977); *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975).

119. *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968).